7256

STATE v. WINTER.

1. CHARGE.—By stating the issues in this case the trial Judge held to have sufficiently stated the law.
2. CHARGE THAT ONE RECEIVING STOLEN GOODS knowing them to be stolen is guilty held correct.
3. IBID.—The evidence in this case held to warrant a conviction for receiving brass known to have been stolen from the Southern Railway.
4. IBID.—EVIDENCE.—Under indictment for receiving stolen goods knowing them to have been stolen, evidence of other like acts is competent to show the *scienter*.
5. CHARGE.—Failure to charge a proposition not requested is not error.

Before GARY, J., Richland, Summer term, 1908. Affirmed.

Indictment against Wolfe Winter. From sentence on verdict, defendant appeals.

*Messrs. James Verner* and *John J. Earle,* for appellant.

*Solicitor W. H. Cobb,* contra.

July 20, 1909. The opinion of the Court was delivered by

MR. JUSTICE GARY. The defendant was indicted for receiving stolen goods, found guilty by the jury and sentenced by the Court, whereupon he appealed to this Court.

The first assignment of error, which we will consider, is raised by the following exception: "Because his Honor, the presiding Judge, erred in that he did not declare the law to the jury at all, but merely stated the issues; the error being that it was the duty of the presiding Judge to declare the law of the case to the jury, and the privilege of the defendant to have him do so, and a failure on the part of the presiding Judge to declare the law of the case to the jury, was an invasion of the defendant's rights."

The charge of his Honor, the presiding Judge, was as follows: "Mr. Foreman and gentlemen: This indictment against Wolfe Winter is for receiving stolen goods, knowing them to be stolen. There are two issues for you, and only two: The first is were the goods stolen; the second issue is did Wolfe Winter receive them, knowing them to be stolen? If you are satisfied of both of these issues, beyond a reasonable doubt, say guilty; if you have a reasonable doubt about either of them, say not guilty. First, were the goods stolen; secondly, did he know they were stolen when he received them, if he did receive them. Take the record and find a verdict."

The only issues involved were those stated by the Circuit Judge, and they were dependent upon the view which the jury might entertain in regard to the testimony. No

further instructions were necessary to enable the jury to render a proper verdict.

The next question that will be considered is presented by the following exception: "Because his Honor, the presiding Judge, erred in that he charged the jury that if they should find that Wolfe Winter received stolen goods, knowing them to be stolen, then he would be guilty; the error being that in law the mere receiving of stolen goods, knowing them to be stolen, is no crime; but in order to make the receiving of stolen goods, knowing them to be stolen, a crime, the person receiving them must do so with a felonious and an evil intent, with the intent to deprive the owner thereof of the use of the same, to assist the thief in disposing of the same, or to appropriate them to the use of the one receiving them, and the Court erred in not so instructing the jury."

In the case of the *State* v. *Crawford,* 39 S. C., 343, his Honor, the presiding Judge, charged the jury, "that if this old man did receive $20 worth of the goods, charged in the indictment, knowing them to have been stolen, and you so believe, beyond a reasonable doubt, you will find him guilty; if not, you will say 'not guilty.' " This Court said: "We think the defendant had no right to complain, for if there was error it was in his favor." See, also, *State* v. *Scovel,* 1 Mills', 274.

We proceed to the consideration of the following exception: "Because there was no evidence whatsoever upon which to base a verdict of guilty, in that there was no evidence at all that the goods alleged to have been received by the defendant had been feloniously taken from the Southern Railway Company, without its consent and with intent to deprive it of the use thereof."

C. R. Arthur testified as follows: "Q. What is your official position? A. Master mechanic Southern Railway. Q. What do you know about this matter? A. On February 25th I was requested to go down to the Seaboard freight

station and look at a lot of brass that was in the station, to see if I could identify any of them belonging to the Southern; I found about 275 pounds of brass, 156 pounds positively identified as the Southern Railway brass; about 10 per cent. of that 156 pounds was new brass; had not been used.    Q. The brass you found and identified as belonging to your railroad, the Southern, amounted to ——————? A. $39 at that time.    Q. Where was this brass?. A. In the Seaboard Air Line freight station, on Gervais street.    Q. The brasses, the kind you found there, were such as are in constant use with your road?    A. They are.    Q. State what part of the cars the brasses come from?    A. Car journal, axle or car journal.    Q. Do I understand you, that some part of that brass was broken up and you could not identify?    A. Was 115 pounds that I was unable to identify.    Q. You could not identify 115 pounds; you did identify as the property of the Southern $39 worth of brass? A. Yes, sir.    Q. That sort of brass you identified, is it on the market for sale here?    A. No, sir; not by the railroad company.    Q. Is it for sale as junk, new brass, the kind you found?    A. Not by the Southern.    Q. The sort of brass you found there, what concerns here have it; I don't mean that particular brass, but brass of that kind?    A. Nobody but railroad companies."

On cross-examination he testified: "Q. You did not find any pieces in the original, like this piece (exhibiting to witness the brass that was in Court)?    A. No, sir; all had been broken up.    Q. How can you recognize that as Southern brass?    A. By the stamp and the pattern.    Q. You could recognize it?    A. By matching the broken pieces up. We matched 156 pounds, until they made the complete brasses.    Q. (By Solicitor Benet) You have had brass of this sort stolen from the company?    A. Any number of them.    Q. I understood you to say you sold to Ajax?    A. Usually dispose to Ajax, except when we use it at our foundries.    Q. Is there any way I could take that brass

and break it up? A. Yes, sir. Q. How? A. Heat it, and a light blow will cause it to break to pieces."

W. R. Newman testified as follows: "Q. What is your occupation? A. Special agent of the Seaboard. Q. The indictment here is against Wolfe Winter for certain pieces of brass found down at the station. State what you know about that matter. A. I went down there with Mr. Arthur and some others and examined the brasses, and matched them up to see who they belonged to. Q. Where did you get the brass from that day? A. Barrel. Q. How was the barrel marked? A. Ajax Metal Company, Philadelphia. Q. Were you present when that barrel was first opened? A. No. Q. Were you present when the brass was taken out of that barrel? A. Yes, sir. Q. Did you get 156 pounds, which you matched? A. Yes, sir; we matched it up on the floor. Q. You are the special agent of the Seaboard Air Line? A. Yes, sir. Q. Does or not your road sell brass of that sort, even when worn out, to junk dealers? A. No, sir. Q. To whom do you dispose of it? A. Ajax Metal Company."

As the Southern Railway did not dispose of such brasses, except to the Ajax Metal Company, it might reasonably have been inferred that they were stolen, especially when the testimony showed they were broken into small pieces, with the apparent intention of avoiding detection.

The last exception to be considered is as follows: "Because there was no evidence whatsoever showing or tending to show that the defendant knew at the time that he received said goods that they were stolen goods."

Wolfe Winter, the defendant, testified: "Q. Would you buy any brass that came to you; did you buy all the brass that was in that barrel? A. Yes. Q. Did you buy it all at one time? A. No. Q. Did you buy it all from one person? A. No. Q. How long were you buying that? A. Two or three weeks. Q. When you would buy little pieces of brass from anybody what would you do? A. I put them

together in the junk office, in the room.   Q. When you got
enough to make a barrel full what would you do?   A. I
ship to Ajax Metal Company Seaboard depot.   Q. How
many persons would you buy it from?   A. I could not tell—
twenty or fifty.   Q. Did you know any of that brass you
had in that barrel was stolen from the railroad?   A. I don't
know it.   When I buy brasses I put the name in a book,
and the chief of police see the book.   Mr. Ford knows I
would bring the book.   Q. Did you ever know any of the
brass you ever bought to be stolen?   A. I don't know.   Q.
Who did you buy this brass from?   A. I don't know.   Q.
Can't you remember a single person?   A. No; I bought it
from a wagon; I bought iron and brass.   Q. How about
that brass, that 400 pounds of brass, from whom did you
buy it?   A. I buy it from many people; I could not
remember; I got it from lot of men."

On cross-examination he testified: "Q. Isn't it a matter
of fact that you admitted in the recorder's court—isn't it a
matter of fact you paid $10 fine in the recorder's court after
admitting you bought two pieces of brass and paid $1.50
for them?   A. A white man bring to me two brasses tied
in a piece of paper; and that white man, he tell me name;
I put the name on the book; I put it down; I say the
detective sent you with this; I give you $1.50 to leave me
alone, as soon as the brass will come; better give to him;
and that man went out, and I leave it by the scale.   Mr.
Ford come in, and I said 'Here's the brass;' I paid him
$1.50 for it, as he started crying; say he got a wife; then
the recorder fine me $10."

There are a number of circumstances in the testimony
tending to show that the defendant received said goods,
knowing them to be stolen: (1) The unsatisfactory account
which he gave of the manner in which he came into pos-
session of the brasses—not even being able to mention the
name of a single person from whom he purchased any of
them.   (2) His conviction before the recorder for buying

stolen brasses, knowing them to be stolen. (3) Buying stolen brasses belonging to the Southern Railway Company a short time before the last purchase, even if it be conceded that he did know that they were stolen. (4) The fact that the brasses were broken into small pieces, apparently with the intention of concealment.

The fact that such circumstances tended to show guilty knowledge on the part of the defendant will appear by reference to the following authorities:

1 Greenleaf on Evidence, sec. 53, note (b), where it is said: "The general rule undoubtedly is that a distinct crime, unconnected with that laid in the indictment, can not be given in evidence against a prisoner. It is not proper to raise a presumption of guilt on the ground that having committed one crime the depravity it exhibits makes it likely that he would commit another. In all criminal cases, however, where the felonious intent or guilty knowledge is a material part of the crime, evidence is admissible of similar acts of the prisoner at different times, if such acts tend to prove the existence of such·guilty knowledge or felonious intent."

Roscoe on Criminal Evidence, at page 92, where the author thus states the rule: "There are three classes of offenses in which, from the nature of the offense itself, the necessity for this species of evidence is so frequently necessary that they will be considered separately. These are conspiracy, uttering forged instruments or counterfeit coin, and receiving stolen goods. In these the act itself, which is the subject of inquiry, is almost always of an equivocal kind, and from which *malus animus* can not, as in crimes of violence, be presumed; and almost the only evidence which could be adduced to show the guilt of the prisoner would be his conduct on other occasions."

In the case of the *State* v. *Jacob,* 80 S. C., 131, 135, it was held that it was not error to receive testimony, offered by the prosecution, to show that about the same time defend-

17—83

ant, who was on trial for receiving stolen goods, knowing them to be stolen, had in his possession other stolen goods of the same owner, even without showing defendant's guilty knowledge as to such other goods.

In that case the Court used this language: "It is, however, ingeniously argued by the counsel for appellants, that testimony that the accused has received other articles of stolen property than those mentioned in the indictment, even for the purpose of showing the *scienter,* is not competent unless it appears that the accused received such other articles, knowing them to be stolen; and, it must be conceded, that there are expressions in the cases cited by him which would seem to warrant such a limitation of the rule; but we know of no case in which it has been so decided. While the fact that one has received a single article of stolen goods would afford but slight, if any, evidence that he knew such article was stolen, yet if it is shown that he has received a number of articles of stolen property, especially where, as in this case, such articles were shown to have been stolen from the same person, and probably about the same time, this is a circumstance from which guilty knowledge may be inferred, though the weight to be attached to such circumstances is exclusively for the jury."

The remaining exceptions must also be overruled, for the reason that they merely assign error on the part of his Honor, the presiding Judge, in failing to charge certain propositions, when there were no requests embodying them.

It is the judgment of this Court that the judgment of the Circuit Court be affirmed.